## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| HCC MANUFACTURING, LLC, | Case No. 24-cv-1013 (LMP/EMB) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| JEFFREY A. ROBINSON and CAPITAL AVENUE CORPORATION, | |
| Defendants. | |

Erik R. Neusch, **Neusch Law, Denver, CO**; and Mary-Cate S. Cicero, **Monroe Moxness Berg PA, Minneapolis, MN**, for Plaintiff.

Andrew L. Marshall and Jeffrey R. Mulder, **Bassford Remele, Minneapolis, MN**, for Defendants.

Plaintiff HCC Manufacturing, LLC ("HCC"), seeking funding to launch a new business, entered a loan agreement in May 2021 with Defendant Capital Avenue Corporation ("CAC"). CAC failed to deliver the funds it promised to HCC, however, and HCC was unable to launch its intended business. HCC later learned that CAC itself never had the funds to finance the loan and was relying on third parties to obtain that funding, which never materialized. HCC claims that had it known this information, it would not have entered the loan agreement.

HCC brings claims under Minnesota law of fraudulent misrepresentation and concealment, negligent misrepresentation, breach of contract, and conversion. ECF No. 6 ¶¶ 76–101. HCC seeks damages for the losses it allegedly sustained or, alternatively, an order requiring CAC to perform under the loan agreement. *See id.* at 17. Defendants now

move for summary judgment, ECF No. 76, arguing that HCC's claims lack merit and that the relief HCC seeks is unavailable as a matter of law, *see generally* ECF No. 77.

Having reviewed and considered the parties' arguments and the record in this case, the Court concludes that each of HCC's claims fails as a matter of law. Accordingly, the Court grants CAC's motion for summary judgment and dismisses HCC's complaint.

## FACTUAL BACKGROUND

In 2020, Aaron Buscher and Benjamin Ray began developing an idea to start a business that would manufacture ammunition primers in the United States. *See* ECF No. 80-2 at 131:3–132:3, 133:9–18; ECF No. 80-18. To that end, Buscher formed HCC, a Colorado limited liability company, in February 2021. ECF No. 90 ¶ 1. Although Buscher is HCC's sole owner and formal member, *id.*, HCC held Ray out to potential investors as one of HCC's "principals" and "founding members" and as its "chief commercial officer," ECF No. 80-3 at 68:3–9. Ray reported to Buscher, ECF No. 80-2 at 270:2–15, and was authorized to speak on HCC's behalf, ECF No. 80-3 at 67:17–21.

Defendant Jeffrey A. Robinson is the sole owner and principal of CAC, a Minnesota corporation. ECF No. 79 ¶ 1; ECF No. 91-6 at 23. Sometime in late 2019 or early 2020, Robinson met Taimour Zaman, a capital strategist based in Toronto, Canada, who operated a company called AI Line of Credit ("AILC"). *See* ECF No. 79 ¶ 2. Zaman introduced Robinson to the idea of funding commercial loans by monetizing standby letters of credit.[1]

---

[1]    A "standby latter of credit" is a "letter of credit used to guarantee either a monetary or a nonmonetary obligation . . . , whereby the issuing bank agrees to pay the beneficiary if the bank customer defaults on its obligation." *Letter of Credit*, Black's Law Dictionary (12th ed. 2024).

*Id.* ¶ 3. Zaman worked with Steven de Koenigswarter, an individual in the Netherlands, *see* ECF No. 80-1 at 137, who Zaman and Robinson believed was "a member of the Rothschild family" who "worked with large funding platforms," *see* ECF No. 79 ¶ 4. Zaman told Robinson that de Koenigswarter "had abilities beyond our comprehension" to "fund loans as an alternative funding to banks and hedge funds and insurance companies." ECF No. 91-12 at 17–18. CAC subsequently entered a revenue sharing agreement sometime in late 2020 or early 2021 with AILC, de Koenigswarter, and Zaman's attorney Gary Farb. ECF No. 92 at 1; *see also* ECF No. 91-41 (unexecuted draft agreement dated March 18, 2021, but with a "start date" of December 18, 2020). Under that agreement, CAC would identify potential borrowers and act as a lender, AILC and de Koenigswarter would approve and generate funding to finance any loans, Farb would act as the escrow agent for the loans, and the parties would share any profits generated from the loans. *See* ECF No. 92 at 1, 3–6; ECF No. 79 ¶¶ 5–6.

While seeking funding to start HCC's operations, Buscher and Ray were introduced to Robinson by Mark McCracken and Tom Shults, who ran a company called Spartan Brokers and with whom Ray had a preexisting professional relationship. *See* ECF No. 90 ¶ 3; ECF No. 80-8 at 5; ECF No. 80-2 at 291:12–16; ECF No. 80-1 at 78–79.

In February 2021, Buscher, Ray, and Robinson had a conference call to discuss CAC's loan programs. ECF No. 90 ¶ 21. Robinson presented a program with a $100 million "minimum deal size" in which CAC would take a "39% equity position" in HCC, and Robinson, on behalf of CAC, would become a "co-CFO." *See* ECF No. 80-12,

3

Ex. M at 2:25–4:22.[2] Ray asked "how the money comes in to fund the operational growth," specifically as it relates to the timing of "tranches," referring to large transfers of money received by CAC that CAC then would use to fund its loan and capital investment obligations. *Id.* at 4:55–5:06. Robinson explained that "for the really, really big money, which is $100 million and up," the "sources of all of [CAC's] capital" were "hedge funds," "insurance companies," and "private equity folks." *Id.* at 5:07–5:52. He noted that CAC did not "charge any fees upfront" and would "only get paid if [HCC] gets funded." *Id.* at 6:12–6:25. Robinson further explained that HCC would have to put up "around $1.5 million" to participate in the loan program, which would "open[] up two credit facilities: one with a large bank in the U.K., and another with a hedge fund down in, ah, New Zealand." *Id.* at 6:45–7:40. These "credit facilities" would then "trade against" HCC's "line of credit" to generate the financing for the loan. *Id.* Robinson warned, however, that "the tranches are unreliable, and the amount of the tranches are unreliable," *id.* at 11:24–11:33, and that this kind of "structured financing" is "not guaranteed to work," *id.* at 6:32–7:12. Robinson further cautioned Buscher and Ray that it was "possible" HCC would not receive the money it requested and that "if you guys are into planning and very uptight about specific amounts of money from the tranches and when they're going to come, this is not for you." *Id.* at 12:18–12:39. HCC chose not to participate in this loan program because it "seemed too risky," was for "more money than [HCC] need[ed]," and

---

[2]     Exhibit M, attached to the Declaration of Andrew L. Marshall in support of Defendants' motion, ECF No. 80 ¶ 16, is an audio recording of the February 2021 call between Buscher, Ray, and Robinson.

4

had "too many moving pieces" that Buscher and Ray "didn't feel comfortable with." ECF No. 80-2 at 319:8–320:5.

The parties continued their discussions, and Robinson later presented a different option to Buscher and Ray in which HCC could provide a $500,000 deposit for a $9.5 million loan, or a $250,000 deposit for a $4.75 million loan. *See* ECF No. 90 ¶ 3; *see also* ECF No. 80-1 at 115–16; ECF No. 80-2 at 199:18–200:2. HCC "did not have the deposit money" for the $9.5 million loan, ECF No. 80-2 at 190:1–12, so Buscher and Ray chose instead to pursue and combine two separate $4.75 million loans: one through HCC, and one through Ray's separate company, Tribusette, LLC, *see* ECF No. 90 ¶ 3. On May 2, 2021, CAC sent a letter to HCC stating that HCC was "pre-approved for a 5 million dollar unsecured loan"[3] and outlining general terms for the loan. ECF No. 91-2. Buscher approved the terms in the pre-approval letter on May 3, 2021. ECF No. 80-11 at 1.

CAC's attorney sent a draft loan agreement to HCC the next day and "strongly suggest[ed]" that Buscher "have an attorney review" the draft agreement. *Id.* Buscher did not retain an attorney to review the agreement on HCC's behalf, however, and instead relied on the representations of a "friend of [Ray's]," who is an attorney, who purportedly reviewed the loan agreement and stated that it contained "standard verbiage." *See* ECF No. 80-3 at 137:25–138:7. Buscher "never talked to" that attorney, does not know how much time the attorney spent reviewing the loan agreement, and cannot confirm that the attorney read the entire agreement. *Id.* at 138:16–139:2. Buscher executed the loan

---

[3] The $5 million figure included both the $4.75 million principal amount of the loan and the $250,000 deposit. *See* ECF No. 80-1 at 115–16.

agreement on HCC's behalf on May 5, 2021, one day after receiving the draft from CAC's attorney. ECF No. 90 ¶ 7; *see* ECF No. 91-3 at 15.

The loan agreement required HCC to wire $250,000 in "immediately available funds" to Farb and to submit certain documents relating to HCC's business to CAC. ECF No. 91-3 at 3, 5–6, 16; *see* ECF No. 91-2. Upon receipt of the $250,000 deposit and documentation, CAC was to deliver the $4.75 million principal amount to HCC by August 24, 2021, which was designated as the "Closing Date." *Id.* at 2, 4. The loan agreement also required HCC: (1) to agree not to hold CAC liable for "any acts or omissions or for any error of judgment or mistake of fact or law" relating to the agreement unless caused by CAC's "gross negligence or willful misconduct," *id.* at 9; and (2) to waive "any claim against [CAC], on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages)" relating to the loan agreement or "the transactions contemplated" in the loan agreement, *id.* at 12. The loan agreement contained a provision whereby HCC acknowledged CAC's "right to enter into one or more participations with respect to" its obligations without prior notice to HCC or HCC's consent. *Id.* at 13. The loan agreement did not disclose CAC's revenue sharing agreement with AILC and de Koenigswarter. *See generally id.*

In the days leading up to HCC executing the loan agreement, Ray began informing potential business partners and investors that HCC was submitting "paperwork and $500k" to "secure a $10mm debt loan from a Canadian firm." ECF No. 91-31 at 2. HCC also took out a $500,000 loan with an individual named Daniel Rossiter to satisfy both HCC's and Tribusette's deposit requirements. ECF No. 90 ¶ 16; *see* ECF No. 91-10 at 4–5. Buscher

6

wired HCC's $250,000 deposit to Farb on May 5, 2021, the same day he executed the loan agreement on HCC's behalf. ECF No. 90 ¶¶ 7–8. Buscher and Ray then began exploring potential manufacturing sites in Wyoming and negotiating with a Belgian company to design and build a manufacturing facility. *See* ECF No. 90 ¶ 14; ECF No. 80-21 at 4–12. HCC did not enter any binding agreements relating to those endeavors. *See* ECF No. 80-2 at 310:13–316:20.

On August 22, 2021—two days before the closing date of the loan agreement—Robinson informed Ray that the loan program "had been oversubscribed" and that CAC needed an extension to provide the funding it promised to HCC. ECF No. 80-1 at 72–73. Robinson also told Ray that "the loan was with somebody named Taimour," referring to Zaman. *See id.* Ray did not know who "Taimour" was, and it was the first time he became aware that "the money was not coming from" CAC. *Id.* On the August 24, 2021 closing date, HCC and CAC executed an amendment to the loan agreement extending the closing date to October 30, 2021, and modifying other terms of the loan. ECF No. 91-4; *see* ECF No. 79 ¶ 16; ECF No. 90 ¶ 10.

Zaman and de Koenigswarter assured Robinson that the funding was merely delayed, ECF No. 79 ¶ 15, and Robinson assured Buscher and Ray that the loan funding was "imminent," ECF No. 90 ¶ 11. In October 2021, Robinson began sending audio recordings to Buscher and Ray of conversations between Robinson and someone only identified as "Steve," referring to de Koenigswarter, to provide updates about the loan funding and reassurance that it was forthcoming. *See id.* ¶ 12; ECF No. 80-1 at 127–28;

*see also* ECF No. 79 ¶ 17.  Buscher and Ray were unaware of who "Steve" was at the time. *See* ECF No. 90 ¶ 12.

On October 30, 2021, the extended closing date of the loan agreement, ECF No. 91-4, CAC again failed to deliver the funds to HCC, *see* ECF No. 90 ¶ 10.  That day, Ray had a telephone conference with Robinson, de Koenigswarter, McCracken, and Shults, among others, to discuss the situation.  *See* ECF No. 80-1 at 132; ECF No. 91-30 at 1.  De Koenigswarter assured the group that the funding would be delivered by December 31, 2021.  *See* ECF No. 80-1 at 132.  Rather than canceling the loan agreement, HCC agreed to wait.  *See id.* at 148.

The funding never materialized, ECF No. 90 ¶ 10, and on March 4, 2022, CAC returned HCC's $250,000 deposit, ECF No. 79 ¶ 18; ECF No. 90 ¶ 18.  From at least May 2021, when HCC and CAC entered the loan agreement, through March 2022, when CAC returned HCC's deposit, HCC never attempted to secure other loans or financing from other lenders or investors.  *See* ECF No. 80-2 at 318:23–319:2, 322:20–25; ECF No. 80-3 at 278:22–279:21.  Without any funding, HCC was unable to secure manufacturing and land-purchase agreements and incurred "substantial late fees" on its loan from Rossiter. *See* ECF No. 91-9 at 4–5; ECF No. 90 ¶ 15.  HCC never launched its manufacturing business.  ECF No. 90 ¶ 15.

HCC filed this lawsuit against Defendants on March 21, 2024.  ECF No. 1.  In the operative amended complaint, HCC brings claims under Minnesota law for fraudulent misrepresentation and concealment, negligent misrepresentation, breach of contract, and

conversion. *See* ECF No. 6 ¶¶ 76–101. Defendants now move for summary judgment on all claims. ECF No. 76.

## ANALYSIS

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citation omitted); *see* Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the Court "must view the record in the light most favorable to the nonmoving party" and "draw all reasonable inferences in the nonmoving party's favor." *Micone v. Levering Reg'l Health Care Ctr., L.L.C.*, 132 F.4th 1074, 1078 (8th Cir. 2025). The Court need not, however, "accept unreasonable inferences or sheer speculation as fact." *Klum v. City of Davenport*, 145 F.4th 907, 911 (8th Cir. 2025) (citation omitted). The Court may not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (citation omitted).

Upon review of the record, the Court concludes that there are no genuine issues of material fact as to any of HCC's claims and that Defendants are entitled to judgment as a matter of law.

## I.    Fraud Claims

In Minnesota, "a party may be liable for fraud either by making an affirmative statement that is false or by concealing or not disclosing facts under certain circumstances." *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d

682, 695 (Minn. 2014).   When a contract defines the relationship between two parties, however, "a plaintiff is not entitled to recover tort damages save for exceptional cases in which a breach of contract 'constitutes or is accompanied by an independent tort.'" *Russo v. NCS Pearson, Inc.*, 462 F. Supp. 2d 981, 994 (D. Minn. 2006) (quoting *Wild v. Rarig*, 234 N.W.2d 775, 789–90 (Minn. 1975)).   Relevant here, a "fraud claim independent of the contract is actionable, but it must be based upon a misrepresentation that was outside of or collateral to the contract, such as many claims of fraudulent inducement."   *AKA Distrib. Co. v. Whirlpool Corp.*, 137 F.3d 1083, 1086 (8th Cir. 1998)).   "[S]o long as the plaintiff is not allowed 'double recovery,' a district court may conclude that the evidence supports separate claims for both common-law fraud and breach of contract."   *Sorchaga v. Ride Auto, LLC*, 909 N.W.2d 550, 557 (Minn. 2018).

HCC alleges that Defendants both (1) fraudulently misrepresented and (2) fraudulently concealed certain material facts to induce HCC to enter the loan agreement.   ECF No. 6 ¶¶ 77–82, 84–86.   Both claims fail as a matter of law.

### A.      Fraudulent Misrepresentation

To succeed on its claim of fraudulent misrepresentation, HCC must prove: (1) Defendants made a false representation to HCC of a "past or existing material fact" that was "susceptible of knowledge"; (2) Defendants at the time of the representation either made it knowing it was false or "without knowing whether it was true or false"; (3) Defendants intended to induce HCC to "act in reliance" on the representation; (4) the representation caused HCC to act in reliance on it; and (5) HCC suffered damages as a result of that reliance.   *ADT Sec. Servs., Inc. v. Swenson*, 276 F.R.D. 278, 294 (D. Minn.

2011) (quoting *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009)).

HCC contends that "there is a dispute as to the material fact of whether Defendants falsely represented to HCC that CAC was the lender and had the money to lend."  ECF No. 89 at 34.  HCC further asserts that there is no evidence "that Robinson disclosed the investment scheme on which all the funding depended."  *Id.* at 34–35.

There are several problems with HCC's argument.  First and foremost, there is no evidence in the record that Robinson, in his individual capacity or on CAC's behalf, ever affirmatively represented to HCC that CAC itself had the money to finance the loan.  To the contrary, the only evidence in the record relating to the sources of CAC's funding is the February 2021 call between Buscher, Ray, and Robinson, in which Robinson states—albeit in the context of a loan program that HCC declined—that the "sources of all of [CAC's] capital" were "hedge funds," "insurance companies," and "private equity folks."  ECF No. 80-12, Ex. M at 5:07–5:52.  HCC cites nothing in the record that suggests CAC ever made affirmative representations that the loan it promised to HCC would not be funded through external sources, and Buscher's and Ray's apparent belief otherwise is not, by itself, enough to support a claim for fraudulent misrepresentation.  *See Swenson*, 276 F.R.D. at 294.  The closest HCC comes to proving such a statement was made is identifying a statement Robinson made to a *different* borrower who entered a similar loan agreement with CAC: "100% of the capital is MY RISK and my risk only.  So don't let me down.  This is a promissory note . . . it is equivalent to getting an unsecured (no collateral) note from your neighbor."  ECF No. 89 at 35 (quoting ECF No. 91-38 at 2).  But even if this

11

statement was a false representation, it was made to a third party with whom HCC has no relationship, so HCC could not have relied on the statement when it entered the loan agreement with CAC.[4]  *See Swenson*, 276 F.R.D. at 294.

Second, to the extent HCC argues that Defendants misrepresented their ability to fund the loan, regardless of the source of the funds, "[i]t is a well-settled rule that a representation or expectation as to future acts is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." *Valspar Refinish*, 764 N.W.2d at 368–69 (citation omitted).  It is true that "a misrepresentation of a present intention could amount to fraud" if it is "made affirmatively to appear that the promisor had no intention to perform at the time the promise was made."  *Id.* at 369 (citation omitted).  But there is no evidence that Defendants mispresented their *intention* to finance the loan to HCC.  If anything, the fact that CAC entered the separate revenue sharing agreement with AILC and de Koenigswarter suggests that CAC was incentivized to find the funding because Defendants otherwise would not make any profit.  *See Stenberg v. Nw. Nat'l Bank of Rochester*, 238 N.W.2d 218, 219 (Minn. 1976) ("The bank presumably loaned money to plaintiffs . . . to make a profit from the interest derived from said loans. But it would be ludicrous to assume that defendants would deliberately make bad loans for such purposes because those loans would imperil the bank's own money.").

---

[4]     It is also not clear that this statement even suggests that CAC had the funds to finance that borrower's loan.  Instead, it appears merely to state that CAC assumes any risks associated with obtaining the funding to finance that borrower's loan.  *See* ECF No. 91-38 at 2.

Third, HCC ratified the agreement even after it obtained knowledge of the facts underlying its fraud claims. Under Minnesota law, when a party to a contract learns the other party has engaged in fraud relating to the contract, "the plaintiff must promptly notify the other party of the intention to rescind the contract and refrain from engaging in conduct inconsistent with that intention." *Ponzo v. Affordable Homes of Rochester, LLC*, No. A04-2234, 2005 WL 1804644, at *5 (Minn. Ct. App. Aug. 2, 2005) (citing *Gaertner v. Rees*, 107 N.W.2d 365, 368 (Minn. 1961)). "Any act of ratification of [the] contract, after knowledge of the facts authorizing rescission, may terminate the right to rescind." *Id.* (citing *Beck v. Nw. Fed. Sav. & Loan Ass'n*, 288 N.W. 217, 220 (Minn. 1939)). Ratification requires evidence that the plaintiff had "full knowledge of the relevant facts and [its] legal rights" and "intended to relinquish" those legal rights. *Id.* (citing *Freitag v. Wolf*, 226 N.W.2d 868, 870 (Minn. 1975)). A claim of ratification fails, however, if the plaintiff "merely suspects fraud but has insufficient knowledge of the facts." *Id.* (citing *Speiss v. Brandt*, 41 N.W.2d 561, 567 (Minn. 1950)).

HCC argues that there is a genuine dispute as to whether, and when, HCC gained "full knowledge of the relevant facts"—namely, that CAC (1) lacked the funds to finance the loan and (2) was relying on receiving third-party funding. *See* ECF No. 89 at 40. HCC obtained full knowledge of the first fact by no later than August 22, 2021, when Robinson informed Ray that the loan program was "oversubscribed" and that CAC "needed an extension" to fund the loan. *See* ECF No. 80-1 at 72–73. But despite CAC's failure to deliver the promised funds by the original closing date, HCC and CAC executed an amendment to the loan agreement extending the closing date and revising material terms

13

of the initial loan agreement. *See* ECF No. 91-4. And when CAC failed to deliver the promised funds by the extended closing date, HCC did not rescind the loan agreement but instead chose to wait and allow more time for CAC to obtain the funds. *See* ECF No. 80-1 at 148.

HCC had full knowledge of the second fact as of the effective date of its original loan agreement. The loan agreement expressly states that CAC, as the lender, "shall have the right to enter into one or more participations with respect to" its obligations under the agreement—which would include its obligation to provide the funds it promised to HCC, *see* ECF No. 91-3 at 3—"without prior notice or consent of [HCC]," *id.* at 13. HCC complains that "participations" is not defined in the agreement. ECF No. 89 at 43. But that term has a commonly understood meaning in the context of loan agreements: "[t]he coming together of multiple lenders to issue a large loan . . . to one borrower, thereby reducing each lender's individual risk."[5] *Loan Participation*, Black's Law Dictionary (12th ed. 2024). And at the absolute latest, HCC became aware of CAC's reliance on third parties by October 30, 2021, the day that Ray—who HCC described to potential investors as its "chief commercial officer," ECF No. 80-3 at 68:3–9—became aware that CAC was

---

[5]   It is undisputed that HCC did not retain counsel to review the loan agreement prior to Buscher executing it on HCC's behalf, *see* ECF No. 80-3 at 137:25–139:2, despite CAC's attorney urging Buscher to do so, *see* ECF No. 80-14. The fact that Buscher "didn't understand a lot of the verbiage" in the loan agreement, ECF No. 80-3 at 81:8–10, does not make the loan agreement's express language a fraudulent misrepresentation. *Cf. Gartner v. Eikill*, 319 N.W.2d 397, 398 (Minn. 1982) ("In the absence of fraud or misrepresentation, a person who signs a contract may not avoid it on the ground that he . . . thought its terms to be different.").

14

relying on de Koenigswarter to fund the loan, *see* ECF No. 80-1 at 148. Ray also became aware on or around that date that the funding for the loan was to be generated, at least to some degree, through market trading. *See* ECF No. 91-30 at 1. Nevertheless, after obtaining this knowledge, and after CAC again failed to timely fund the loan, HCC did not rescind the agreement. ECF No. 80-1 at 148. And when Robinson informed Buscher that the loan agreement would be canceled if CAC returned HCC's deposit, Buscher stated that HCC "did not want the deposit[] back."[6] ECF No. 80-2 at 294:2–14.

Therefore, even if Defendants misrepresented material facts relating to CAC's ability to finance the loan itself or CAC's reliance on one or more third parties to obtain the funds to finance the loan, there is no genuine dispute that HCC waived any fraud claims related to those misrepresentations. This is because HCC ratified the loan agreement after gaining knowledge that would have authorized rescission of the contract. *See Ponzo*, 2005 WL 1804644, at *5.

At bottom, HCC has not proffered any evidence of an affirmative misrepresentation by Defendants as to any material fact relating to the loan agreement, and there is no genuine dispute that HCC ratified the loan agreement upon obtaining full knowledge of the facts relevant to its fraudulent misrepresentation claim. *See Ponzo*, 2005 WL 1804644, at *5.

---

[6]     Whether CAC refunding HCC's deposit would have had the effect of canceling or rescinding the loan agreement is irrelevant. The importance of Buscher declining to demand a refund of HCC's deposit, under the belief that it *would* cancel the loan agreement, is that it demonstrates HCC "engag[ed] in conduct inconsistent with [an] intention" to rescind the contract. *Ponzo*, 2005 WL 1804644, at *5.

For these reasons, Defendants are entitled to judgment as a matter of law on HCC's fraudulent misrepresentation claim. *See Torgerson*, 643 F.3d at 1042.

### B.   Fraudulent Concealment

Under Minnesota law, "one party to a transaction has no duty to disclose material facts to the other party." *Graphic Commcn's*, 850 N.W.2d at 695. Particularly relevant here, "[c]ourts applying Minnesota law have been reluctant to impose a duty to disclose material facts in arm's-length business transactions between commercial entities." *Driscoll v. Standard Hardware, Inc.*, 785 N.W.2d 805, 813 (Minn. Ct. App. 2010) (citing *Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046, 1065 (D. Minn. 2001)). Nevertheless, "special circumstances may trigger a duty to disclose material facts" in a transaction:

> First, a person who has a confidential or fiduciary relationship with the other party to the transaction must disclose material facts. Second, one who has special knowledge of material facts to which the other party does not have access may have a duty to disclose those facts to the other party. Third, a person who speaks must say enough to prevent the words communicated from misleading the other party.

*Graphic Commcn's*, 850 N.W.2d at 695 (citations omitted); *see Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1073–74 (D. Minn. 2013) (quoting *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 190 (Minn. 1999)) ("For nondisclosure to constitute fraud, there must be a suppression of facts which one party is under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." (internal quotation marks omitted)).

HCC asserts that Defendants did not disclose that CAC was relying on third parties to obtain funds for the loan. *See* ECF No. 89 at 30. But when the alleged fraudulent

concealment "relates to a promisor's duties under the contract, an independent fraudulent concealment claim will not lie." *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 678 (D. Minn. 2021) (citing *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 887 (8th Cir. 2000)). Here, the contract's core purpose was for CAC to deliver the funding it promised to HCC, no matter how CAC obtained that funding. *See* ECF No. 91-3 at 1 ("WHEREAS, [HCC] has requested that [CAC] make an investment in [HCC] in the form of term loan facilities, and [CAC] is willing to do so on the terms and conditions set forth herein."). For this reason alone, HCC cannot maintain its fraudulent concealment claim. *See Cleveland*, 550 F. Supp. 3d at 678.

That aside, there can be no dispute that the loan agreement was an "arm's-length business transaction[] between commercial entities," so under Minnesota law, Defendants generally had no duty to disclose material facts to HCC. *Driscoll*, 785 N.W.2d at 813; *see Graphic Commcn's*, 850 N.W.2d at 695. HCC argues, however, that "special circumstances" exist to depart from that general rule. *See* ECF No. 89 at 39. The Court disagrees.

First, there is no evidence that HCC and Defendants had a "confidential or fiduciary relationship." *Id.* While CAC is not a traditional bank, fiduciary relationships generally do not exist between a bank and its customers unless the bank "knows or has reason to know that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972); *see Hurley v. TCF Banking & Sav., F.A.*, 414 N.W.2d 584, 587 (Minn. Ct. App. 1987) ("Generally, a bank is not in a fiduciary relationship with a customer, rather

17

the relationship is one of debtor and creditor."). Minnesota courts have found such confidential or fiduciary relationships where banks and their customers had long-running relationships. *See Hassman v. First State Bank of Swatara*, 236 N.W. 921, 921–22 (Minn. 1931) (finding fiduciary relationship where the plaintiff "had habitually sought [the banker's] advice for some ten years"); *Todd Enters., LLC v. MidCountry Bank*, No A12-1635, 2013 WL 4045765, at *5 (Minn. Ct. App. Aug. 12, 2013) (affirming finding of fiduciary relationship where the business owners had "a long-term relationship" with the bank and "also enjoyed a long-term relationship . . . in both a personal and professional capacity" with the specific banker with whom they transacted); *but see Klein*, 196 N.W.2d at 622–23 (holding that the plaintiff's twenty-year relationship with the bank "could not by itself place defendant in a confidential relation to plaintiff" and that the plaintiff "occasionally socializ[ing]" with a bank executive's wife could not "change the character of defendant's relation to plaintiff into a fiduciary one"). An additional and important factor in these cases was that the plaintiffs proffered evidence that the bank knew the plaintiffs lacked the capacity for good judgment. *See Hassman*, 236 N.W. at 921 (finding fiduciary relationship where the banker knew the plaintiff "was a man of poor business judgment" and "had been suffering from the effects of a disease which undermined his judgment and tended to destroy his mental capacity"); *Todd Enters.*, 2013 WL 4045765, at *5 (affirming finding of fiduciary relationship because there was evidence the banker knew the plaintiff "was suffering from depression severe enough to lower his ability to make reasoned decisions"); *Klein*, 196 N.W.2d at 622 (finding no fiduciary relationship because there was no evidence the banker "knew that plaintiff was an alcoholic" or "lacked

18

good judgment in business matters"). Here, there is no evidence of any relationship between HCC and Defendants until early 2021, a few months before HCC and CAC entered the loan agreement, nor is there evidence that Robinson had any reason to believe that Buscher "placed such great trust in him and lacked good judgment in business matters." *Klein*, 196 N.W.2d at 622.

Second, there is no evidence that Defendants had "special knowledge of material facts" to which HCC did not "have access." *Graphic Commcn's*, 850 N.W. 2d at 695. HCC contends that Defendants' undisclosed revenue sharing agreement with AILC and de Koenigswarter was a material fact which Defendants concealed because it would have "deterred or prevented" HCC from entering into the loan agreement. *See* ECF No. 89 at 30–31. But there is no evidence to support HCC's assertion other than Buscher's declaration to that effect, *see* ECF No. 90 ¶ 13, and "it is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion," *Keiran v. Home Cap., Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.").

On the contrary, once it became clear that CAC was unable to fund the loan in August 2021, HCC agreed to extend the closing date to October 2021. ECF No. 91-4. And after it was revealed in October 2021, at the latest, that CAC was relying on third parties to generate the funds for the loan, HCC did not rescind the loan agreement and instead

19

chose to wait for CAC to obtain the funds. *See* ECF No. 80-1 at 148. In fact, HCC never attempted to rescind the loan agreement or to secure financing from other sources. *See* ECF No. 80-2 at 205:24–207:22. The evidence in the record does not permit an inference that CAC's involvement in the third-party investment agreement was a material fact that would have caused HCC not to enter the loan agreement. *See Klum*, 145 F.4th at 911 (citation omitted) (explaining that courts are not required to "accept unreasonable inferences or sheer speculation as fact" in deciding motions for summary judgment).

Third, there is no evidence that Defendants misled HCC about any facts relating to the loan agreement, whether expressly or by omission. *See Graphic Commcn's*, 850 N.W. 2d at 695. Buscher appears to have believed that the loan agreement would not be financed by external sources merely because, unlike the loan program discussed in the parties' February 2021 call, CAC did not require an equity stake in HCC as part of the loan agreement. *See* ECF No. 90 ¶ 23; ECF No. 80-12, Ex. M at 2:25–4:22. But there is nothing in the record to suggest that Defendants ever made any representations that suggested that was the case. And, again, the loan agreement expressly states that CAC could "enter into one or more participations" without providing notice to HCC or obtaining HCC's consent. *See* ECF No. 91-3 at 13.

Based on the evidence in the record, the Court concludes that Defendants had no duty to disclose material facts to HCC relating to the loan agreement. *See Graphic Commcn's*, 850 N.W.2d at 695; *Driscoll*, 785 N.W.2d at 813. Accordingly, HCC's fraudulent concealment claim fails as a matter of law.

## II.   Negligent Misrepresentation

To prevail on its claim of negligent misrepresentation, HCC must prove: (1) Defendants owed HCC a duty of care; (2) Defendants "supplie[d] false information" to HCC; (3) HCC justifiably relied on the information; and (4) Defendants failed to "exercise reasonable care in communicating the information." *Nelson v. Am. Fam. Mut. Ins. Co.*, 899 F.3d 475, 481 (8th Cir. 2018) (quoting *Williams v. Smith*, 820 N.W.2d 807, 815 (Minn. 2012)). If a duty exists in any given case, "it is derived from the legal relationship between the parties and a determination that the plaintiff's interests are entitled to legal protection against [the] defendant's conduct." *Williams*, 820 N.W.2d at 816.

Defendants did not owe HCC a duty of care here as a matter of law. The Minnesota Court of Appeals has held that where "adversarial parties negotiate at arm's length, there is no duty imposed such that a party could be liable for negligent misrepresentations." *Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424 (Minn. Ct. App. 2000). This is because "the law of negligent representation imposes a duty on parties providing information for the guidance of others in the course of business or where there is a pecuniary interest," and "[i]n other commercial relationships, *for example between parties to a contract*, the aggrieved party is limited to suit in contract or in fraud." *Safeco Ins. Co. of Am. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 873 (Minn. Ct. App. 1995) (emphasis added). The Minnesota Supreme Court, for its part, has "declined to decide whether a negligent misrepresentation claim can be brought by a party to an arm's-length commercial transaction." *Williams*, 820 N.W.2d at 816 (citing *Valspar Refinish*, 764 N.W.2d at 370 n.7). The Minnesota Supreme Court has acknowledged, however, that "[o]ther state courts

21

that have considered this issue have not extended the duty of care" to such transactions. *Id.* (first citing *Fry v. Mount*, 554 N.W.2d 263, 266 (Iowa 1996); and then citing *Onita Pac. Corp. v. Trs. of Bronson*, 843 P.2d 890, 897 (Or. 1992)).

Because the Court is applying Minnesota law here, it must follow the decisions of the Minnesota Supreme Court. *Minn. Supply Co. & Raymond Corp.*, 472 F.3d 524, 534 (8th Cir. 2006). With no decision from the Minnesota Supreme Court squarely addressing the precise issue presented here, the Court must "follow decisions of the intermediate state court when they are the best evidence of Minnesota law." *Neth. Ins. Co. v. Main St. Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) (citation omitted). The Minnesota Court of Appeals has consistently held that no duty of care exists between parties engaged in an arm's-length commercial transaction and, accordingly, that there can be no liability for negligent misrepresentation claim relating to such a transaction. *See, e.g.*, *Smith*, 605 N.W.2d at 424; *Thompson v. Riess*, No. A18-1110, 2019 WL 510034, at *5 (Minn. Ct. App. Feb. 11, 2019). And "judges in this District uniformly have done the same." *Blue Cross & Blue Shield of N.C. v. Rite Aid Corp.*, 519 F. Supp. 3d 522, 543–44 (D. Minn. 2021) (collecting cases). There is no reason to depart from these decisions. The Court therefore concludes that HCC's negligent misrepresentation claim fails as a matter of law.

## III.    Breach of Contract

To prove its breach-of-contract claim, HCC must establish that: (1) a valid contract was formed; (2) HCC performed any conditions precedent to its right to demand performance by Defendants; and (3) Defendants breached the contract. *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). In addition to proving breach, HCC

22

also "has the burden of proving damages." *Shikur v. Halverson*, No. A21-0959, 2022 WL 829362, at *5 (Minn. Ct. App. Mar. 21, 2022).

As an initial matter, although Robinson executed the initial loan agreement and the amendment on behalf of CAC, Robinson, in his individual capacity, is not a party to either agreement. *See* ECF Nos. 91-3, 91-4. "A person cannot be sued for breach of contract unless he is a party to that contract." *Shikur*, 2022 WL 829362, at *3 (citing *Mahoney v. McLean*, 4 N.W. 784, 784 (Minn. 1880)); *see also Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 498 F. Supp. 3d 1080, 1092 (D. Minn. 2020) (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)) ("It goes without saying that a contract cannot bind a nonparty."). Accordingly, HCC cannot maintain its breach-of-contract claim against Robinson as a matter of law.

Turning to HCC's claim against CAC, neither party disputes the validity of the loan agreement, that HCC fulfilled the conditions precedent to its right to demand CAC's performance of its obligations, and that CAC never delivered the $4.75 million it promised to HCC. *See* ECF No. 77 at 29. Based on these undisputed facts, CAC plainly breached the loan agreement. *See Hamann*, 808 N.W.2d at 833.

The question, then, is whether HCC can meet its "burden of proving damages" resulting from CAC's breach. *Shikur*, 2022 WL 829362, at *5. HCC claims it suffered $8 million in consequential damages and lost future profits and separately requests relief in the form of specific performance. ECF No. 6 ¶¶ 96–97; *see* ECF No. 89 at 43. But HCC does not provide sufficient evidence for a reasonable jury to conclude it suffered the damages it claims. *See Huber v. Westar Foods, Inc.*, 139 F.4th 615, 620 (8th Cir. 2025)

23

(quoting *Anderson*, 477 U.S. at 248) ("A genuine issue for trial exists when 'a reasonable jury could return a verdict for the nonmoving party.'").  And specific performance is not available as a remedy in this case.

Begin with HCC's claims for monetary damages.  When a contract to lend money is breached by the lender, "the basic measure of damages" generally is "the expense of getting another loan, consisting principally of the difference between the interest that the borrower contracted to pay and what the borrower was compelled to pay to procure a replacement loan."  25 Williston on Contracts § 66:100 (4th ed., May 2025 update) (citing *Swaney v. Crawley*, 157 N.W. 910, 912 (Minn. 1916)).  HCC never secured, or made serious efforts to secure, any loans from other lenders.  ECF No. 80-2 at 318:23–319:2, 322:20–25.  Indeed, Buscher testified that HCC never discussed specific terms with other lenders and does not "know for sure what they were going to require" to provide loans to HCC.  ECF No. 80-3 at 278:22–279:21.  And it is undisputed that CAC returned HCC's $250,000 deposit in March 2022.  *See* ECF No. 79 ¶ 18; ECF No. 90 ¶ 18.

As it relates specifically to HCC's claims for consequential damages and lost profits, there are two separate provisions in the loan agreement that preclude or substantially limit HCC's ability to seek relief.  First, HCC agreed that CAC may not be held liable "for any acts or omissions or for any error of judgment or mistake of fact or law other than [CAC's] gross negligence or willful misconduct."  ECF No. 91-3 at 9.  Under Minnesota law, "ordinary negligence" is the "failure to exercise such care as persons of ordinary prudence usually exercise under such circumstances."  *Anderson v. Rugged Races, LLC*, 42 F.4th 955, 958 (8th Cir. 2022) (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011)).

24

"Gross negligence," however, is "substantially and appreciably higher in magnitude than ordinary negligence . . . [and is] the absence of slight diligence, or the want of even scant care." *Id.* (alteration in original) (quoting *State v. Bolsinger*, 21 N.W.2d 480, 485 (Minn. 1946)).  There is no evidence that CAC's failure to timely deliver the money it promised to HCC was the product of willful misconduct, and HCC cites no evidence or authority that would support a finding of gross negligence by Defendants.  *See* ECF No. 89 at 43–44. HCC merely states, without citing to any evidence in the record, that the applicability of the exceptions in the loan agreement relating to damages for gross negligence and willful misconduct is "a disputed material fact."  *Id.* at 44.  But at this summary judgment stage, HCC must cite "to particular parts of materials in the record" to show that a fact "is genuinely disputed."   Fed. R. Civ. P. 56(c)(1)(A).   HCC's unsupported, conclusory assertion is insufficient to avoid summary judgment.

Second, HCC agreed, in a section titled "Waiver of Consequential Damages," to waive "any claim against [CAC], on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages)" relating to the loan agreement, "the transactions contemplated" in the loan agreement, or "the use of the proceeds" of the intended loan.  ECF No. 91-3 at 12.  On its face, this provision plainly precludes HCC from seeking the types of damages it seeks.  And even if that were not the case, there is no evidence that HCC actually incurred compensable damages because of CAC's breach.  For example, HCC cites the harm that allegedly flowed from its reliance on CAC timely delivering the promised $4.75 million, "including devoting significant time meeting with people and negotiating the build-out contract with the leading primer

25

manufacturing company."   ECF No. 89 at 5 (citing ECF No. 90 ¶ 14).   HCC cites no evidence in the record, however, that quantifies these purported damages.  *See* Fed. R. Civ. P. 56(c)(1)(A).  And it is undisputed that HCC never entered into any binding agreements for the purpose of building a manufacturing facility.  *See* ECF No. 80-2 at 310:13–316:20. The notion that any of the third parties with which HCC negotiated necessarily would have entered binding agreements with HCC were it not for CAC breaching the loan agreement is purely speculative.  *See id.* at 314:1–316:2; *see also Klum*, 145 F.4th at 911 (explaining that courts are not required to "accept unreasonable inferences or sheer speculation as fact" in deciding motions for summary judgment).

Although "lost profits" are not expressly identified in the waiver clause, the clause nonetheless applies to HCC's claim for lost profits.  Such damages generally are considered consequential damages under Minnesota law because they are "not based on the capital or present value of the promised performance but upon benefits it can produce or losses that may be caused by its absence."  *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 961 (8th Cir. 2000) (citation omitted); *see Jacobson Warehouse Co. v. Schnuck Mkts., Inc.*, 13 F.4th 659, 673 (8th Cir. 2021) (classifying a claim of lost profits based on "loss of sales to third-party customers" as consequential damages because the sales were "not assured" and the "lost profits [could not] reasonably be described as 'the direct and natural consequence' of a breach"); *see also, e.g.*, *Hydra-Mac, Inc. v. Onan Corp.*, 450 N.W.2d 913, 920 (Minn. 1990) (discussing "lost profits" and "consequential damages" interchangeably); *Jacobs v. Rosemount Dodge-Winnebago S.*, 310 N.W.2d 71, 78 (Minn. 1981) (same).  Because HCC's claim for lost profits hinges entirely on "losses that may

26

[have been] caused by [the] absence" of the loan funding promised by CAC, *Porous Media*, 220 F.3d at 961 (citation omitted), it therefore is properly understood as a claim for consequential damages, which the loan agreement expressly precludes, *see* ECF No. 91-3 at 12.

Notwithstanding the loan agreement's waiver clause, CAC argues that such relief is unavailable to HCC because it was a "new business." ECF No. 77 at 25. But there is "no per se rule" that a new business cannot "recover damages for loss of prospective profits." *Speed RMG Partners, LLC v. Arctic Cat Inc.*, No. 20-cv-609 (NEB/LIB), 2023 WL 11960176, at *10 (D. Minn. July 25, 2023) (quoting *Leoni v. Bemis Co.*, 255 N.W.2d 824, 826 (Minn. 1977)). Yet, even though such damages are not categorically barred, "[t]he burden of proof of lost profits is particularly heavy in the case of a new business." *Unique Sys., Inc. v. Zotos Int'l, Inc.*, 622 F.2d 373, 378 (8th Cir. 1980). "What is important is that the loss be established with reasonable certainty, and this depends upon the circumstances of the particular case." *Speed RMG Partners*, 2023 WL 11960176, at *10 (quoting *Cardinal Consulting Co. v. Circo Resorts, Inc.*, 297 N.W.2d 260, 267 (Minn. 1980)).

HCC relies on its expert's opinion that it suffered $10.8 million in lost profits because of CAC's breach of the loan agreement. ECF No. 98 at 8. But that conclusion rests entirely on unsupported speculation that the Court need not accept as fact. *Klum*, 145 F.4th at 911. Notably, HCC's expert acknowledges that HCC "projected the need for a total of approximately $35 million in loans and investments to fully fund" HCC's operations. ECF No. 98 at 10. Put another way, the $4.75 million CAC owed to HCC represented less than 14% of the financing that HCC's expert forecasts HCC needed to

fund its operations. *See id.* HCC's expert also notes that HCC anticipated about $25.5 million of that $35 million—roughly 73%—would come from "equity capital from family, friends and other third parties" and "loans from banking institutions." *Id.* But there is no evidence HCC ever made serious efforts to secure any of this other funding. *See* ECF No. 80-2 at 205:24–207:13, 258:13–259:12; ECF No. 80-3 at 278:13–281:20. Further, it is undisputed that neither Buscher nor Ray had any experience with manufacturing ammunition or ammunition components. *See* ECF No. 80-2 at 134:11–15; ECF No. 80-1 at 87. Given these facts, there simply is no basis for an inference that HCC would have been able to begin operations even if CAC had delivered the funds it promised. *See Klum*, 145 F.4th at 911. And it is far from reasonably certain that HCC would have earned $10.8 million in profits but for CAC's failure to provide those funds. *See Speed RMG Partners*, 2023 WL 11960176, at *10.

Finally, turning to HCC's request for specific performance, it is well established that such equitable remedies are not available for breach of contract in Minnesota "where there is an adequate remedy at law." *Schmitz v. Rinke, Noonan, Smoley, Deter, Colombo, Wiant, Von Korff & Hobbs, Ltd.*, 783 N.W.2d 733, 747 (Minn. Ct. App. 2010) (citing *Shaughnessy v. Eidsmo*, 23 N.W.2d 362, 368 (Minn. 1946)). More specifically, a "court of equity . . . will not specifically enforce an action to pay money." *In re MJK Clearing, Inc.*, 286 B.R. 109, 125 (Bankr. D. Minn. 2002) (citing *Butler Bros. v. Levin*, 207 N.W. 315, 317 (Minn. 1926)); *see Irvine v. Armstrong*, 17 N.W. 343, 343 (Minn. 1883) ("The general rule is that any agreement will be enforced specifically in a court of equity, where the specified thing or act contracted for, and *not mere pecuniary compensation*, is the redress practically

28

required." (emphasis added)); *see also Raton Waterworks Co. v. Town of Raton*, 174 U.S. 360, 364 (1899) (stating that "an action at law is the proper remedy" to enforce payments of money).  The fact that HCC cannot demonstrate a genuine dispute as to its entitlement to relief at law on its breach-of-contract claim does not make equitable relief, especially specific performance, available to HCC under the circumstances of this case.  *See MJK Clearing*, 286 B.R. at 125; *Irvine*, 17 N.W. at 343.

In sum, although CAC breached the loan agreement by failing to deliver the funds it promised to HCC, there is no evidence that CAC's breach caused HCC any actual damages because CAC returned HCC's deposit, ECF No. 90 ¶ 18, and HCC did not obtain alternative loans under less favorable terms, *see* 25 Williston on Contracts § 66:100 (4th ed., May 2025 update) (citing *Swaney*, 157 N.W. at 912).  To the extent HCC suffered consequential damages or lost profits because of CAC's breach, HCC waived its right to seek precisely the types of damages it requests.  *See* ECF No. 91-3 at 9, 11–12.  And even if had not waived its right to seek such damages, HCC either does not quantify and offers only unsupported speculation regarding those damages.  *See Speed RMG Partners*, 2023 WL 11960176, at *10.  Finally, specific performance is not a remedy available to HCC under the circumstances of this case.  *See MJK Clearing*, 286 B.R. at 125; *Irvine*, 17 N.W. at 343.  HCC therefore cannot prevail on its breach-of-contract claim.  *See Shikur*, 2022 WL 829362, at *5; *Huber*, 139 F.4th at 620.

## IV.    Conversion

In Minnesota, conversion is "an act of willful interference with the personal property of another, done without lawful justification, by which any person entitled thereto is

deprived of use and possession, and the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (citation modified). The Minnesota Court of Appeals has held that where the purportedly converted property is money, "an electronic financial transaction cannot be the basis of a conversion claim." *TCI Bus. Cap., Inc. v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 429 (Minn. Ct. App. 2017). Instead, such claims are viable "only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money." *Id.* The Minnesota Court of Appeals reached this conclusion for three reasons: (1) the Minnesota Supreme Court has typically defined property as goods, and all of its prior opinions regarding conversion concerned tangible physical property—that is, "items that can be seen and touched"; (2) the conclusion was consistent with the only precedential opinion by the Minnesota Court of Appeals expressly addressing the issue; and (3) the conclusion was "consistent with the traditional common-law rule that an electronic financial transaction cannot be the basis of a conversion claim." *Id.* at 428–29.

It is undisputed that HCC's $250,000 deposit was made by wire transfer. *See* ECF No. 90 ¶ 8; ECF No. 80-3 at 256:4–9, 257:3–258:2. Under *TCI*, such a transaction "cannot be the basis of a conversion claim." 890 N.W.2d at 429. Accordingly, HCC's conversion claim fails as a matter of law.

## CONCLUSION

The Court concludes that there is no genuine dispute of material fact as to any of HCC's claims, and the record shows that Defendants are entitled to judgment as a matter

of law.  *See Torgerson*, 643 F.3d at 1042; Fed. R. Civ. P. 56(a).  Accordingly, based on the

foregoing, and on all the files, records, and proceedings in this matter, **IT IS HEREBY**

**ORDERED** that:

1.  Defendants' Motion for Summary Judgment (ECF No. 76) is **GRANTED**;

2.  HCC's Amended Complaint (ECF No. 6) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: June 26, 2026                    *s/Laura M. Provinzino*

                                       Laura M. Provinzino
                                       United States District Judge